OPINION OF THE COURT
Jones, J.
The Public Employment Relations Board is not precluded from determining that concerted refusal of bus drivers to perform duties in the normal manner for the purpose of securing job-related demands constitutes a strike in violation of the Taylor Law although the normal manner of performance would entail violations of the Vehicle and Traffic Law where citation to such violations is only a pretext. In this instance the record contains substantial evidence to sustain such determination made by the board.
Local 252 of the Transport Workers Union of America, AFL-CIO, is the certified bargaining representative for a negotiating unit of some 640 public employees of the Metropolitan Suburban Bus Authority. Approximately 460 of these employees, the group which is the subject of the instant illegal strike charge, are bus drivers in the author *359 ity’s surface transportation system which serves areas in Nassau County.
The authority and the union were unable to reach agreement on a contract for the calendar year 1979, the prior agreement having expired on December 31, 1978. As a result, the unit members were working under terms and conditions imposed by the authority pursuant to the impasse procedures of section 209 of the Civil Service Law. In November of 1979, the union and the authority began negotiations for a bargaining agreement to take effect in 1980.
Sometime in November, the president of the union instructed the bus drivers at “safety classes” that they did not have to operate buses which violated the requirements of the Vehicle and Traffic Law. He told them that the union would back them up if they refused to drive buses with violations but that any bus which was in compliance with provisions of law was to be driven.
At a negotiating meeting in December of 1979, the union president warned the authority that there would be “big trouble” if the parties did not agree on a contract by 12:01 a.m. on January 1, 1980, when the arrangements then in effect were to expire. The authority and the union were thereafter unsuccessful in their efforts to reach an agreement by the end of 1979.
During the period between January 2 and January 10, 1980, many drivers submitted “bad order forms” listing equipment defects discovered on inspection of their assigned buses. The drivers submitted these forms prior to the start of their runs instead of waiting until they had completed their runs as had previously been their normal practice. In consequence the number of bus runs not operated increased significantly.
On January 8, 1980, the authority obtained a preliminary injunction from Supreme Court restraining the union members and officers from engaging in or in any way aiding or abetting a strike or other concerted stoppage or slowdown of work by any employees of the authority. The court also ordered the drivers not to “bad order” any bus unless it had a defect which presented a clear and present *360 danger to the bus operator, the public or the users of the highways. In its opinion, the court listed certain equipment defects which would pose such an imminent danger along with other defects which would not pose such a danger. The union president went to the bus depots on January 9,1980 and advised the drivers of the terms of the court order. Thereafter, the percentage of bus runs not operated declined substantially, although on both January 9 and 10 the percentage was still higher than normal.
On April 1, 1980, after a collective bargaining agreement had been reached and ratified, the union president stated in a union newsletter that:
“I’d like to take this opportunity to thank my Union officials and, especially, the Union membership, for their overwhelming support and ratification of the M.T.A. contract offer.
“I think we showed other Unions, as well as management, that in Unity there is Strength. We showed our unity from day one, with the bus safety check, in court before Judge Altimari and the continuing safety check of our buses, in spite of the Judge’s order. Again, it was this Unity of the membership that showed management the strength the Union has, and will continue to have from now on.”
On May 29, 1980, counsel to the New York State Public Employment Relations Board (PERB) filed a charge alleging that the union had “caused, instigated, encouraged, condoned and engaged in a strike against the State during the period of January 2, 1980 through January 10, 1980”. The thrust of the charge was that numerous employees represented by the union had failed to perform their duties fully either because of a failure to perform their duties in accordance with existing practices or because of unauthorized absence from work. It was alleged that these refusals to work and absences were concerted acts of the union and its members, officers, and representatives.
In its answer, the union denied the substantive allegations made in the charge. It also set up several defenses, among which was the defense that any reduction in service was due to the employer’s failure to abide by traffic law *361 requirements and that a strike could not consist of a refusal to work in the usual manner where performance in that manner would require the employees to violate the law.
Following hearings on the charge, the hearing officer recommended that the charge be dismissed on the ground that the conduct of the union and its members did not constitute a strike prohibited by subdivision 1 of section 210 of the Civil Service Law (the Taylor Law). After excluding bus runs not made due to legitimate absences by drivers,[1] the hearing officer found that the percentage of runs not-made was far higher than usual and that this increase was due primarily to a lack of equipment caused by “bad ordering” of buses prior to runs, contrary to the drivers’ normal practice. Consequently, the hearing officer found sufficient evidence that many drivers were not operating as they had previously. The hearing officer further found that if this conduct constituted a strike, the union was responsible.
After noting that the charge did not include “bad ordering” for defects which posed a clear and present danger under the Supreme Court order, the hearing officer accepted the union’s defense that it could not be charged with striking for refusing to perform work in the usual manner where requiring normal performance would compel employees to violate the law. The hearing officer summarized the equipment requirements of the Vehicle and Traffic Law and noted that operation of any motor vehicle lacking this equipment is a traffic infraction. He pointed out that under the law the chauffeur is responsible for such an infraction, that an infraction is punishable by fine or imprisonment, and that the chauffeur can be assigned two points pursuant to commissioner’s regulation except for some equipment violations incurred while operating the carrier’s vehicle at work. The hearing officer also noted that violations could harm employees’ job standing due to licensing requirements and because employers are required to review each driver’s record annually and to consider the driver’s traffic law violations along with any *362 disregard for public safety. Further, he took note of the potential civil liability to which a driver could be exposed for violating the law.
The hearing officer concluded that employees should not be required to choose between the consequences of violating section 210 of the Civil Service Law by refusing to operate buses lacking the required equipment and those of violating other laws or regulations by operating the buses. He thus read section 210 as not making illegal employee conduct which is required by other laws. Accordingly, he recommended that the charge be dismissed in all respects.
PERB, in a 2-1 decision, concluded that the drivers had engaged in a strike from January 2 through January 8, 1980 by refusing to operate buses which were not dangerous within the court order although perhaps in violation of the Vehicle and Traffic Law. The board found that the refusal to work did not involve any imminent threat to person or property and that the provisions of law were used as a mere pretext for the drivers’ concerted refusal to work in their normal manner. It determined that plans for the refusal to drive defective buses had been formulated more than a month prior to their implementation and that the sole purpose of those plans was to secure collective bargaining demands. According to the board, public employees’ abnormal and overly meticulous adherence to law and rules which has the effect of interfering with the performance of the employer’s mission and which is designed to extract bargaining concessions from the employer can be a strike within the contemplation of the Taylor Law.
The board concluded, however, that there had been no strike on January 9 and 10, the days following the Supreme Court order, there being no evidence that the union was responsible on those days for any refusals to drive buses.
In assessing a penalty, the board noted that this was the second strike by the union in which employees disqualified buses for equipment defects. Due to the limited impact of the strike charged, however, the board imposed the lowest suspension of dues deduction privileges that it had imposed on any employee organization for a second violation of *363 section 210 of the Civil Service Law; the union’s dues deduction privileges were suspended indefinitely with leave to apply for full restoration of the privileges after the suspension had been in effect for one year.
The dissenting board member disagreed with the majority that it can be a strike under the Taylor Law if employees, for the purpose of securing negotiating demands, concertedly refuse to perform job duties in their normal manner when that normal manner would violate State law. He reasoned that the requirements of the Taylor Law and the provisions of the Vehicle and Traffic Law have a common purpose related to the performance of tasks by these employees so that they are in pari materia and should be construed together. He concluded that the Taylor Law forbids bus drivers from abstaining from the full performance of their normal duties only to the extent such normal duties are not prohibited by the Vehicle and Traffic Law.
Following transfer from Supreme Court, the Appellate Division annulled the PERB determination. The court ruled that the finding of a strike was not in accord with the proof and that the board had arbitrarily and capriciously jumped to conclusions not bottomed on evidence in the record. The court believed that the board’s determination was based primarily on the remark made by the union president that there would be “big trouble” if no contract were reached by January 1 but that the president had later shown he was acting in good faith when he persuaded drivers to comply with the Supreme Court order. We reverse the determination of the Appellate Division and reinstate that of the board.
We first must consider the legal issue presented in this case whether, when public employees alter the normal manner in which they perform their duties in order to extract bargaining concessions, but that normal manner violates State law, their conduct can legally be held to constitute a strike prohibited by the Taylor Law. Subdivision 1 of section 210 of the Civil Service Law contains a blanket prohibition against strikes by public employees: “No public employee or employee organization shall engage in a strike, and no public employee or employee *364 organization shall cause, instigate, encourage, or condone a strike.” The term “strike” is defined by subdivision 9 of section 201 of the Civil Service Law in expansive terms as “any strike or other concerted stoppage of work or slowdown by public employees.” These provisions, literally read, contain no exception for what the union would assert to be a “justified” strike — whether justified by law or other legitimate motivating reason. We have no occasion in the context of the present case, however, to determine whether there is merit to the categorical position advanced on behalf of the authority — that the sweep of the literal definition in subdivision 9 of section 201 is so broad as to admit of no exception and accordingly that any concerted stoppage or slowdown is a strike, whatever its motivation or the circumstances in which it takes place. A very much narrower focus suffices for the disposition of the present appeal.
The conclusion of the board that the union’s invoking reference to the provisions of the Vehicle and Traffic Law was “merely a pretext for the concerted refusal of the drivers to operate the buses” finds ample support in the record. No proof was offered, for instance, that the sanctions and penalties now conjectured would likely have been imposed in the period January 2 to January 8 had the drivers continued to perform their duties in what had been the normal manner. Perhaps most significant, there was no proof that the bus drivers were in the least apprehensive that continuation of past practice would expose them to penalties for violation of the Vehicle and Traffic Law or that their action in refusing to continue the past practice was in any way motivated by a concern for strict observance of the law, in theory or in fact. The dire consequences of violation of the law now envisaged — penal convictions, revocation of operating licenses, civil liability arising out of accidents which might occur, exposure to personal risks or to “job consequences” — must be characterized in the circumstances disclosed in this record as no more than a pretextual construct.[2]
*365 In Matter of Acosta v Wollett (55 NY2d 761) we upheld a determination that there had been a strike where, following destruction by fire of the building in which they normally worked, employees of the State Unemployment Insurance Department refused to work in temporary locations, notwithstanding the circumstance that their refusal was based on assertions that the working conditions at the temporary location, for which no certificate of occupancy had been issued, were hazardous and uncomfortable — that the building was unheated because the boiler was not operating, that the wires from the space heaters lying along the floor made walking hazardous, that the electricity was deficient, that exits were limited, that one toilet was stopped up. There, although the concerted action was at least taken to remedy the working conditions complained of, the concerted action of the employees was found to be unreasonable and thus warranted the determination that there had been a strike. Here the refusal to drive buses was not even calculated to enforce strict compliance on the part of the authority with the provisions of the Vehicle and Traffic Law; it was undertaken to force acceptance by the authority of the terms of a new collective bargaining agreement and thus presents an even stronger case for support of the board’s determination that this union had violated the Taylor Law.
In Van Vlack v Ternullo (53 NY2d 1003) we similarly sustained a determination that there had been a strike within the contemplation of the Taylor Law when maintenance workers and teachers at the Fishkill Correctional Facility refused to accept out-of-title emergency assignments as replacements for striking correction officers where the hearing officer who heard the testimony concluded that the employees had not met their burden of proof that their refusal was due to a bona fide fear of personal injuries or future reprisals or both. In the case now before us, by like token, there was no evidence that *366 the bus drivers’ action in January, 1980 was motivated by concern for compliance with the provisions of the Vehicle and Traffic Law.
We do not hold that concerted refusal to engage in conduct which would entail violation of law, if taken for the purpose of enforcing job-related demands, may always be determined to constitute a strike within the contemplation of the Taylor Law. We do hold that where, as here, the reliance on a sudden concern for overly meticulous and abnormal observance of statutory commands is purely a subterfuge, the incidental circumstance that continued performance of duties in the normal manner might entail violations of statute does not legally preclude a finding that there has been a strike.
Having concluded that there is no legal barrier to such a determination, we turn to a consideration whether there was substantial evidence to support PERB’s factual determination in this case that there was a strike under the Taylor Law. The finding of a substantial change in the drivers’ normal practice is supported by testimony that there was a significant increase in the percentage of buses not operated and that this was caused by “bad ordering” before the start of runs rather than after runs. That the strike was the responsibility of the union is evidenced by the union’s holding “safety classes” in which members were told they did not have to drive buses with traffic law violations, by statements made by the union president that there would be “big trouble” if an agreement were not reached by January 1, and by the newsletter later sent to members in which the union president thanked them for their support and said that they had shown their unity with the bus safety check. Although the hearing officer made no explicit finding that in “bad ordering” the buses the union had used traffic law violations as a pretext to secure its collective bargaining demands, PERB could properly draw such a conclusion by inference from the facts found by the hearing officer, particularly where the union was found responsible for the job action, the job action was timed to occur immediately following the expiration of the interim impasse arrangement, and only violations posing no imminent danger to the safety of the public or the *367 drivers were involved in the charge. In these circumstances we have no difficulty in concluding that PERB’s finding of a strike is grounded on substantial evidence in the record.
For the reasons stated, the judgment of the Appellate Division should be reversed, with costs, and the determination of PERB reinstated.
Chief Judge Cooke and Judges Jasen, Wachtler, Fuchsberg, Meyer and Simons concur.
Judgment reversed, etc.

. The hearing officer found no basis to sustain the authority’s charge of unauthorized absenteeism.

. There is no merit to the contention advanced by the union that to sustain the determination of the board in this instance is tantamount to holding that the proscrip *365 tions of the Vehicle and Traffic Law have been repealed by the Taylor Law or a holding that the provisions of the Vehicle and Traffic Law are not binding on the authority’s bus drivers. There is no necessity here to fashion the reconciliation of any apparently conflicting or incongruous statutes which may be said, as urged by the union, to stand in pari materia. Our holding here is that there is substantial evidence to support the determination of PERB that the possible application of the Vehicle and Traffic Law was functionally immaterial to the operational dynamics of this case.